**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| HEALTHY GULF<br>935 Gravier Street<br>Suite 700<br>New Orleans, LA 70112,<br><br>FRIENDS OF THE EARTH<br>1101 15th Street, NW<br>11th Floor<br>Washington, DC 20005,<br><br>CENTER FOR BIOLOGICAL DIVERSITY<br>378 N Main Avenue<br>Tucson, AZ 85701,<br><br>NATURAL RESOURCES DEFENSE<br>COUNCIL<br>40 West 20th Street<br>11th Floor<br>New York, NY 10011,<br><br>and<br><br>SIERRA CLUB<br>2101 Webster Street<br>Suite 1300<br>Oakland, CA 94612,<br><br>       *Plaintiffs*,<br><br>  v.<br><br>DOUG BURGUM, in his official capacity as<br>SECRETARY OF THE INTERIOR<br>1849 C Street NW<br>Washington, DC 20240,<br><br>MATTHEW GIACONA, in his official<br>capacity as ACTING DIRECTOR, BUREAU<br>OF OCEAN ENERGY MANAGEMENT<br>1849 C Street NW<br>Washington, DC 20240, | Civil Action No. 26-cv-2150 |

1

U.S. DEPARTMENT OF THE INTERIOR
1849 C Street NW
Washington, DC 20240,

and

BUREAU OF OCEAN ENERGY
MANAGEMENT
1849 C Street NW
Washington, DC 20240,

*Defendants.*

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

1.     Plaintiffs Healthy Gulf, Friends of the Earth, Center for Biological Diversity, Natural Resources Defense Council, and Sierra Club (collectively, "Plaintiffs") challenge the unlawful decision by Secretary of the Interior Doug Burgum, acting through his delegated authority to Matthew Giacona, Acting Director of the Bureau of Ocean Energy Management, the Department of the Interior, and the Bureau of Ocean Energy Management (the "Bureau" or "BOEM") (collectively, "Defendants") to hold the Gulf of America Outer Continental Shelf Oil and Gas One Big Beautiful Bill Act Lease Sale 2 ("BBG2") in March 2026. In finalizing BBG2, Defendants violated numerous legal requirements that apply to offshore oil and gas leasing, resulting in a decision that fails to properly consider or mitigate the extensive harms from this action to the Gulf ecosystem and surrounding communities.

2.     The Gulf of Mexico[1] is one of the most productive and biodiverse ecosystems in the United States, providing a home to thousands of species ranging from simple invertebrates to highly evolved marine mammals including dolphins and whales. The Gulf includes habitat for five of the world's seven species of sea turtles and is the exclusive home of the critically endangered Rice's whale, a species that the National Marine Fisheries Service ("NMFS") currently estimates may have only fifty-one individuals remaining. Millions of people who live in Gulf Coast states depend on this productive marine environment to support coastal fisheries, tourism, and recreational opportunities.

---

[1] On January 20, 2025, President Trump issued Executive Order 14172 to rename this area as the "Gulf of America." 90 Fed. Reg. 8629 (Jan. 31, 2025). This Complaint refers to this area as the "Gulf of Mexico" in accordance with the historic name as reflected in the Outer Continental Shelf Lands Act, 43 U.S.C. § 1331 *et seq.*

3.      Oil and gas operations in the Gulf have already caused grave harm to this ecosystem and the wildlife that depend on it. These adverse impacts have resulted from seismic activities, ship strikes, air and water pollution, and oil spills, including the massive Deepwater Horizon spill in 2010. For example, studies estimate that the Rice's whale suffered a twenty-two percent population loss from the 2010 disaster and nearly half of the species' habitat was coated by the spill, resulting in longer-term lethal and non-lethal impacts. Gulf communities have also suffered from the pollution impacts of oil and gas activities and infrastructure, including from refineries, petrochemical plants, and defunct offshore wells, pipelines, and platforms. The oil and natural gas production resulting from BBG2 over the next fifty years will lock in decades of greenhouse gas pollution that will exacerbate the climate crisis worldwide and increase harms to these communities.

4.      Despite the sale's significant environmental impacts, the Bureau declined to conduct any environmental review for BBG2 as required by the National Environmental Policy Act ("NEPA"). The Bureau also finalized the sale without first considering available relevant environmental information or conducting an environmental study required by the Outer Continental Shelf Lands Act ("OCSLA") to establish information needed to assess and manage the environmental impacts of oil and gas development on the Gulf's human, marine, and coastal environments. Specifically, the Bureau has never studied the significant and growing environmental threats posed by oil and gas infrastructure that is idle, orphaned, or otherwise overdue for decommissioning.

5.      In addition, the Bureau failed to follow the consultation requirements of the Endangered Species Act ("ESA") to ensure that BBG2 is not likely to jeopardize the continued existence of the critically endangered Rice's whale. The Bureau dismissed relevant evidence and

failed to provide sufficient protective measures to address the threats posed by oil spills, noise from seismic surveys, and the vulnerability of the species to vessel strikes, among other impacts.

6. Defendant Giacona's involvement in the approval of BBG2 further tainted the decision to hold this sale given his prior recent lobbying work for the National Ocean Industries Association ("NOIA"). Upon his hiring by the Bureau in March 2025, the Department of the Interior Ethics Office specifically instructed Mr. Giacona to recuse himself from matters that would trigger federal impartiality rules until March 2026. Mr. Giacona's failure to heed those directives and subsequent extensive participation in this matter demonstrates that Defendants' approval of BBG2 was arbitrary and capricious and without observance of procedure required by law.

7. The Bureau's arbitrary and capricious decision to hold BBG2 violated NEPA, OCSLA, the ESA, and the Administrative Procedure Act ("APA"), and resulted in Defendants making this lease sale decision in an improper manner and without an adequate consideration or understanding of its environmental effects or a proper consideration of alternatives.

8. Plaintiffs ask this Court to declare that Defendants' decision to hold BBG2 violated NEPA, OCSLA, the ESA, and the APA, to vacate the Final Notice of Sale for BBG2, and to vacate or enjoin any leases issued or actions taken pursuant to the unlawful lease sale unless and until Defendants comply with the law.

**JURISDICTION AND VENUE**

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question), 5 U.S.C. §§ 702–06 (APA), 43 U.S.C. § 1349(b) (OCSLA), and 16 U.S.C. § 1540(g) (ESA). The Final Notice of Sale for BBG2 is a final agency action for which there is no other adequate remedy in a court. *See* 5 U.S.C. § 704.

10. Pursuant to 43 U.S.C. § 1349(a)(2) and 16 U.S.C. § 1540(g), Plaintiffs gave the

Defendants sixty days' written notice of their intent to sue under OCSLA and the ESA by email and letter dated March 3, 2026. Defendants have not taken action to remedy their continuing violations by the date of filing of this Complaint. Therefore, an actual controversy exists between the parties under 28 U.S.C. § 2201.

11.     Venue is appropriate under 28 U.S.C. § 1391(e)(1), 43 U.S.C. § 1349(b), and 16 U.S.C. § 1540(g) because the U.S. Department of the Interior and the Bureau's headquarters are located in this District, Defendant Burgum and Defendant Giacona reside in this District, a plaintiff resides in this District, and a substantial part of the events and omissions which gave rise to this action occurred in this District.

12.     This Court has authority to grant the requested relief in this case pursuant to the APA, 5 U.S.C. § 706, the Declaratory Judgment Act, 28 U.S.C. §§ 2201–02, OCSLA, 43 U.S.C. § 1349(a), and the ESA, 16 U.S.C. § 1540(g).

**PARTIES**

13.     Plaintiff HEALTHY GULF is a network of community, conservation, environmental, and fishing groups and individuals committed to empowering people to protect and restore the natural resources of the Gulf of Mexico. Healthy Gulf's purpose is to collaborate with and serve communities who love the Gulf of Mexico by providing research, communications, and coalition-building tools needed to reverse the long-pattern of over-exploitation of the Gulf's natural resources. Healthy Gulf has been actively involved in efforts to strengthen oversight of the offshore oil and gas industry and end new oil and gas leasing in this region. Healthy Gulf is headquartered in New Orleans, Louisiana, with offices in Pensacola, Florida and Madison, Mississippi. Healthy Gulf's members live in the five Gulf states of Texas, Louisiana, Mississippi, Alabama, and Florida, and nationwide. For example, a member of

Healthy Gulf is a small business owner of a Ship Island excursion company which offers cruises to Ship Island, offshore from Mississippi, as well as dolphin watching cruises in the Gulf. The business has been in his family for generations. He relies on a healthy environment, clean waters, and healthy marine life to continue the family business which has already been adversely impacted by oil and gas development activities in the Gulf, as well as resulting climate change. Healthy Gulf brings this action for itself and as representative of its members.

14.     Plaintiff FRIENDS OF THE EARTH ("FoE") is a 501(c)(3) nonprofit, membership-based organization headquartered in Washington, D.C. FoE currently has over 4.8 million activists and over 150,000 members, located across all fifty states and the District of Columbia. FoE's primary mission is to defend the environment and champion a more healthy and just world by collectively ensuring environmental and social justice, human dignity, and respect for human rights and peoples' rights. FoE and its members are dedicated to fighting to reduce greenhouse gas ("GHG") emissions and domestic reliance on fossil fuels and support a temporary pause on oil and gas leasing on federal public lands and waters. Specifically, FoE's Climate, Energy & Oceans program directly engages in administrative and legal advocacy to protect the environment and society from climate change, pollution, and industrialization associated with fossil fuel development and GHG emissions. FoE's members recreate and enjoy the waters and wildlife in the Gulf. For example, a FoE member, who is also a member of Sierra Club, visits the Gulf of Mexico regularly with his family to fish and recreate, and hopes to continue doing so in the future. He enjoys fishing, surfing, viewing wildlife habitats, and visiting rescued turtles on South Padre Island. His enjoyment depends on a healthy environment and abundant marine wildlife protected from oil and gas impacts. FoE brings this action for themselves and as representatives of its members.

15.     Plaintiff CENTER FOR BIOLOGICAL DIVERSITY ("Center") is a nonprofit corporation that maintains offices across the United States and Baja California Sur, Mexico. The Center advocates for the protection of threatened and endangered species and their habitats through science, policy, and environmental law. The Center's mission also includes protecting air quality, water quality, and public health. The Center's Oceans Program focuses specifically on conserving marine ecosystems and seeks to ensure that imperiled species such as marine mammals, corals, and sea turtles are properly protected from destructive practices in our oceans. The Oceans Program also works to protect coastal communities from air pollution, water pollution, and other impacts that result from such practices. In pursuit of this mission, the Center has been actively involved in protecting the Gulf of Mexico from the harmful impacts of offshore oil and gas drilling. The Center has more than 101,000 members, including members who live and recreate throughout the Gulf of Mexico region. These members appreciate and benefit from wildlife in the Gulf of Mexico, such as Rice's whales, sperm whales, loggerhead sea turtles, Kemp's ridley sea turtles, leatherback sea turtles, and corals threatened by noise pollution, vessel traffic, oil spills, and climate pollution caused by oil and gas activity. For example, one Center member regularly uses the Gulf of Mexico, including the beaches, bays, and coastal waterways in Louisiana, Mississippi, Alabama, and Florida, to walk on the beach, go kayaking or paddleboarding, take out his boat, and observe and look for sea turtles, manatees, and other wildlife. He goes to the Gulf Island National Seashore at least once a month, where he has seen manatees and sea turtles. Another Center member lives in Texas and regularly uses the Gulf of Mexico to go swimming, kite surfing, and to observe and look for wildlife including Kemp's ridley sea turtles, green sea turtles, loggerhead sea turtles, whooping cranes, and other wildlife. He goes to beaches where Kemp's ridleys nest to see these turtles and has participated

in efforts to protect sea turtle nests and rehabilitate and release injured sea turtles back into the wild. The Center's members also enjoy seeing species that visit the Gulf of Mexico when those species have migrated to or are migrating through other parts of the country. For example, one Center member is an avid bird watcher and has traveled to Texas, Louisiana, Florida, Virginia, Maryland, Delaware, and New Jersey to see coastal waterbird species, including eastern black rails. The Center brings this action for itself and as representative of its members.

16.     Plaintiff NATURAL RESOURCES DEFENSE COUNCIL ("NRDC") is a nationwide not-for-profit, tax-exempt membership organization incorporated under New York law. NRDC's mission is to safeguard the earth—its people, its plants and animals, and the natural systems on which all life depends. NRDC has hundreds of thousands of members nationwide, including over 38,000 members in the Gulf. NRDC is working to solve the most pressing environmental issues we face today, including environmental injustice, air pollution, and climate change. NRDC's advocacy to protect ocean and coastal ecosystems and wildlife, including the Gulf of Mexico and its marine life, from the harms of oil production dates back decades. NRDC members have economic, recreational, aesthetic, and other interests in areas and animals threatened by the lease sale. Continued oil and gas development would injure their interests.

17.     Plaintiff SIERRA CLUB is a not-for-profit organization dedicated to exploring, enjoying, and protecting the wild places of the earth; to practicing and promoting the responsible use of the earth's ecosystems and resources; to educating and enlisting humanity to protect and restore the quality of the natural and human environment; and to using all lawful means to carry out these objectives. Sierra Club is one of the oldest and largest conservation groups in the country with approximately 600,000 members nationally in sixty-seven chapters in all of the fifty

states, the District of Columbia, and Puerto Rico, including over 55,000 members in its Gulf chapters. Sierra Club members use the public lands and waters throughout the Gulf, including those that would be affected by oil and gas activities, for quiet recreation, aesthetic pursuits, and spiritual renewal. Sierra Club members further observe and enjoy wildlife found in the Gulf that may be harmed by oil and gas activities. Sierra Club brings this action for itself and as representative of its members.

18.     Plaintiffs and Plaintiffs' members regularly use, enjoy, and benefit from the marine and coastal environments of the Gulf, including waters within and adjacent to the five Gulf states, and plan to continue doing so in the future. Plaintiffs and Plaintiffs' members regularly enjoy and benefit from the presence of healthy marine and avian life within those environments for recreational, aesthetic, commercial, scientific, and environmental purposes, including whale watching, bird watching, scientific study, boat touring, underwater diving, fishing, photography, sculpture, and beach bathing.

19.     The BBG2 lease sale will directly and irreparably injure these interests. BBG2 will, for example, increase vessel traffic and noise pollution and increase the risk of oil spills and other accidents. BBG2 will also contribute to environmental pollution from associated onshore oil and gas infrastructure located in Gulf communities. The abilities of Plaintiffs and Plaintiffs' members to pursue these interests hinge on the health of the marine, coastal, and estuarine ecosystems (with clean water and oil-free beaches) and the well-being of the species that live, migrate, feed, and breed in areas affected by oil and gas activities. Defendants are authorizing oil and gas development without a full and accurate analysis of its impacts or reasoned consideration of how to avoid or mitigate those impacts. These failures are due, at least in part, to Defendant Giacona's involvement in this matter. As a result, Defendants are enabling new oil and gas

development to negatively impact the environment in which Plaintiffs and Plaintiffs' members have an interest. The interests of Plaintiffs and Plaintiffs' members have been, are being, and will be adversely affected by Defendants' violations of federal law, as described herein. These harms can be remedied only if Defendants are forced to comply with the requirements of NEPA, OCSLA, the ESA, and the APA. Were Defendants directed to complete the required NEPA analysis and fully comply with the requirements of OCSLA, the ESA, and the APA, they could avoid leasing and subsequent activities in sensitive habitats, require additional environmental mitigation of the lease sale's impacts, or adopt alternatives that would minimize or avoid such impacts in the first place. Plaintiffs have no other adequate remedy at law.

20. Defendants' failure to comply with NEPA, OCSLA, the ESA, and the APA by not preparing the required environmental analyses and failing to follow procedures required by law also deprives Plaintiffs and their members of procedural rights and information guaranteed by these statutes. Plaintiffs and their members have advocated and will continue to advocate for the protection of the Gulf and in opposition to oil and gas leasing and its environmental impacts; they also seek to discuss the issue with relevant decisionmakers to encourage consideration of measures that would avoid, minimize, or mitigate environmental harm. If Defendants had complied with NEPA, OCSLA, the ESA, and the APA, these processes would have generated additional information on the lease sale's impacts to the species, Gulf communities, and other environmental resources in which Plaintiffs and their members have an interest. Plaintiffs and their members would have access to this information and be better informed about the program and its impacts, improving their ability to participate in decisionmaking and to suggest potential mitigation or alternatives that would protect their recreational, aesthetic, commercial, and scientific interests. With this information, Plaintiffs and their members could also make informed

and safe decisions about their recreational pursuits, and those decisions could affect their livelihoods and overall welfare. Defendants' failure deprives them of this information and the ability to comment on a draft NEPA analysis or to meaningfully participate in the lease sale approval process. If Defendants are required to prepare a NEPA analysis and comply with OCSLA, the ESA, and the APA, these informational and procedural injuries would be redressed.

21.    Defendant DOUG BURGUM is sued in his official capacity as the Secretary of the Interior. He is the chief officer of the Department of the Interior charged with overseeing the proper administration and implementation of OCSLA. OCSLA vests authority in the Secretary of the Interior to hold oil and gas lease sales on the Outer Continental Shelf and to issue leases. The Secretary of the Interior is required to comply with the mandates of NEPA, OCSLA, and the ESA when taking any action affecting the environment.

22.    Defendant MATTHEW GIACONA is sued in his official capacity as the Acting Director, Bureau of Ocean Energy Management. He is the chief officer of the Bureau—the federal agency within the Department of the Interior to which the Secretary has delegated authority under OCSLA to hold oil and gas lease sales on the Outer Continental Shelf and to issue leases. The Acting Director is required to comply with the mandates of NEPA, OCSLA, and the ESA when taking any action affecting the environment.

23.    Defendant U.S. DEPARTMENT OF THE INTERIOR is the federal department with authority, through the Secretary, under OCSLA to hold oil and gas lease sales on the Outer Continental Shelf and to issue leases. The Department of the Interior is required to comply with the mandates of NEPA, OCSLA, and the ESA when taking any action affecting the environment.

24.    Defendant BUREAU OF OCEAN ENERGY MANAGEMENT is the federal agency within the Department of the Interior to which the Secretary has delegated authority

under OCSLA to hold oil and gas lease sales on the Outer Continental Shelf and to issue leases. The Bureau is required to comply with the mandates of NEPA, OCSLA, and the ESA when taking any action affecting the environment.

## STATUTORY BACKGROUND

25.     To hold BBG2, Defendants must comply with several federal statutes, including NEPA, OCSLA, the ESA, the APA, and the 2025 Reconciliation Act, among others.

I.      NATIONAL ENVIRONMENTAL POLICY ACT

26.     Congress enacted NEPA "[t]o declare a national policy which will encourage productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; [and] to enrich the understanding of the ecological systems and natural resources important to the Nation." 42 U.S.C. § 4321.

27.     "NEPA requires the federal government to identify and assess in advance the likely environmental impact of its proposed actions, including its authorization or permitting of private actions." *Sierra Club v. U.S. Army Corps of Eng'rs*, 803 F.3d 31, 36 (D.C. Cir. 2015). This process both ensures that: (1) agencies evaluate prospectively the environmental impacts of proposed actions that they carry out, fund, or authorize; and (2) that detailed information concerning significant environmental impacts "will be made available to the larger [public] audience that may [] play a role in both the decisionmaking process and the implementation of that decision." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989).

28.     Under NEPA, all agencies of the federal government must prepare a "detailed statement" evaluating all "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). This statement, known as an Environmental Impact Statement ("EIS"), must analyze and describe the "reasonably foreseeable environmental

13

effects" of the proposed action, "any irreversible and irretrievable commitments of Federal resources which would be involved in the proposed agency action should it be implemented," as well as a "reasonable range of alternatives" that are technically and economically feasible, including a no action alternative. *Id.*

29.    According to the U.S. Department of the Interior Handbook of National Environmental Policy Act Implementing Procedures, when an agency prepares an EIS for a proposed action, it is required to document its decision on the action in a record of decision ("ROD"). 516 Department Manual § 4.1(a); *see Indian River Cnty. v. Rogoff*, 254 F. Supp. 3d 15, 17 (D.D.C. 2017) ("Under NEPA, a federal agency is required to prepare an [EIS] and a Record of Decision before taking 'major Federal action[ ] significantly affecting the quality of the human environment.'" (quoting 42 U.S.C. § 4332(2)(C))).

30.    The Bureau's decision to hold BBG2 is a major federal action subject to the requirements of NEPA. *See* 42 U.S.C. § 4336e(10) (defining "major federal action" as "an action that the agency carrying out such action determines is subject to substantial Federal control and responsibility"); *Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827 (D.C. Cir. 1972) (challenge to EIS for 380,000-acre lease sale offshore eastern Louisiana); 516 Department Manual § 15.4(1) ("Approval of offshore oil and gas lease sales" included in category of "Major Actions Normally Requiring an EIS").

31.    The Department of the Interior's manual and regulations provide categorical exclusions from NEPA for later stages of oil and gas development in the western and central Gulf of Mexico. 516 Department Manual § 15.4(2); 30 C.F.R. § 550.269(a). For that reason, environmental review at the lease sale stage is particularly important in addressing NEPA's requirements. *See Friends of the Earth v. Haaland*, 583 F. Supp. 3d 113, 133–34 (D.D.C. 2022),

14

*vacated as moot and remanded*, 2023 WL 3144203 (D.C. Cir. Apr. 28, 2023) ("[T]he lease sale stage is the last point at which the Bureau is definitively required to conduct an EIS for leases in the Gulf of Mexico.").

II.     OUTER CONTINENTAL SHELF LANDS ACT

32.     OCSLA governs the leasing, exploration, and development of oil and gas deposits in the Outer Continental Shelf. 43 U.S.C. § 1331 *et seq.* The Outer Continental Shelf extends from the outer boundary of state waters—typically three nautical miles from shore—to the outer boundary of the United States' Exclusive Economic Zone, 200 nautical miles from shore. *Id.* §§ 1301(a)(2), 1331(a); 48 Fed. Reg. 10605 (Mar. 14, 1983).

33.     In 1978, Congress amended OCSLA to provide, in part, for the development of resources on the Outer Continental Shelf "subject to environmental safeguards." 43 U.S.C. § 1332(3).

34.     OCSLA charges the Secretary of the Interior with managing oil and gas activities on the Outer Continental Shelf. *Id.* §§ 1334(a), 1344(a). Management of the Outer Continental Shelf "shall be conducted in a manner which considers economic, social, and environmental values of the renewable and nonrenewable resources contained in the outer Continental Shelf," as well as "the potential impact of oil and gas exploration on other resource values of the outer Continental Shelf and the marine, coastal, and human environments." *Id.* § 1344(a)(1).

35.     OCSLA prescribes four tiered stages for the Secretary to sell and allow development of offshore oil and gas deposits: (1) five-year leasing programs; (2) lease sales; (3) exploration plans; and (4) development and production plans. *Id.* §§ 1337, 1340, 1344, 1351.

36.     At the five-year program stage, the Secretary develops a schedule of proposed lease sales indicating "the size, timing, and location of leasing activity" in identified regions over an upcoming five-year period. *Id.* § 1344(a).

15

37.     At the lease sale stage, the Secretary decides whether and under what conditions to offer for sale leases that "entitle the lessee to explore, develop, and produce the oil and gas contained within the lease area," subject to certain approvals. *Id.* § 1337.

38.     The Secretary "shall consider available relevant environmental information in making decisions" under OCSLA, "including those relating to exploration plans, drilling permits, and development and production plans[], in developing appropriate regulations and lease conditions, and in issuing operating orders." *Id.* § 1346(d).

39.     Prior to holding a lease sale, the Secretary "shall conduct a study of any area or region included in any oil and gas lease sale . . . in order to establish information needed for assessment and management of environmental impacts on the human, marine, and coastal environments of the outer Continental Shelf and the coastal areas which may be affected by oil and gas . . . development in such area or region." 43 U.S.C. § 1346(a)(1); 30 C.F.R. § 556.1300. The study shall "develop[] environmental information" and "shall be designed to predict impacts on the marine biota which may result from," *inter alia*, "chronic low-level pollution or large spills" associated with oil and gas production and "the laying of pipe to serve the offshore production area." 43 U.S.C. § 1346(a)(3). It must also be designed to predict "the impacts of development offshore on the affected and coastal areas." *Id.* "The purposes of such studies will include, to the extent practicable, analyses of the impacts of pollutants introduced into the environments and impacts of offshore activities on the seabed and affected coastal areas." 30 C.F.R. § 556.1300(a). The study, "to the extent possible, will not duplicate studies done under other laws," and must commence at least six months prior to the sale. *Id.* §§ 556.1300(b), (c).

40.     Prior to conducting an offshore lease sale, OCSLA requires that the Bureau issue a Proposed Notice of Sale that describes the proposed size, timing, and location of the sale,

including lease stipulations to mitigate potential adverse impacts on the environment, terms and conditions, minimum bids, royalty rates, and rental rates. 30 C.F.R. § 556.304; *see* 43 U.S.C. § 1345. The Proposed Notice of Sale must be sent to the governors of affected States, and a notice of its availability must be published in the Federal Register. 30 C.F.R. § 556.304(c). Within sixty days after receiving the Proposed Notice of Sale, governors of affected States and local governments may submit comments and recommendations to the Bureau regarding the Proposed Notice of Sale. *Id*. § 556.305(a). The Bureau is required to "consider all comments and recommendations received in response to the proposed notice of sale." *Id*. § 556.307(a).

41.     A Final Notice of Sale must be published at least thirty days before the date of a sale. 43 U.S.C. § 1337(b)(l); 30 C.F.R. § 556.308. This notice must describe the areas offered for lease, lease terms and conditions of sale, and "stipulations to mitigate potential adverse impacts on the environment." 30 C.F.R. § 556.308.

42.     The Secretary retains broad discretion to accept or reject bids that are made on such lease sales. *See id.* § 556.516(b) ("BOEM reserves the right to reject any and all bids received, regardless of the amount offered"). Only "responsible qualified" bidders are eligible to hold oil and gas leases, and OCSLA prohibits submission of bids by companies "not meeting due diligence requirements on other leases." 43 U.S.C. § 1337(a)(1), (d).

43.     Once a lease is issued, a lessee may conduct ancillary activities on its lease without any further federal approval under OCSLA. 30 C.F.R. §§ 550.105, .207–.209. These activities include geological and geophysical exploration, such as seismic reflection and refraction to detect the presence of oil or gas, and other surveys that are needed to determine how to explore or develop a lease. *Id.* §§ 550.105, .207.

44.     The third stage of Outer Continental Shelf planning involves exploration plans

submitted to Interior by lessees, which should provide a schedule of anticipated exploration activities to be undertaken, a description of equipment to be used for such activities, and the general location of each well to be drilled. 43 U.S.C. § 1340.

45.    The fourth and final stage is the submission of development and production plans, which describe facilities and operations proposed by the lessee that will be constructed or utilized in the development and production of oil or gas from the lease area, as well as environmental and safety safeguards to be implemented. *Id.* § 1351.

46.    The Bureau is the federal agency within the Department of the Interior to which the Secretary has delegated authority to manage leasing, exploration, development, and production of oil and gas resources on the Outer Continental Shelf under OCSLA. 30 C.F.R. § 550.101.

III.    ENDANGERED SPECIES ACT

47.    Congress enacted the ESA in 1973 to provide for the conservation of endangered and threatened fish, wildlife, plants, and their natural habitats. 16 U.S.C. § 1531. The ESA imposes substantive and procedural obligations on all federal agencies with regard to species that are listed or proposed for listing under the Act, as well as their critical habitats or proposed critical habitats. *See id*. §§ 1536(a)(1), (a)(2), (a)(4), 1538(a); 50 C.F.R. § 402.01.

48.    In particular, section 7(a)(2) of the ESA and its implementing regulations require each federal agency, in consultation with the appropriate wildlife agency, to insure that any action authorized, funded, or carried out by the agency is not likely to: (1) jeopardize the continued existence of any threatened or endangered species or (2) result in the destruction or adverse modification of the critical habitat of such species. 16 U.S.C. § 1536(a)(2); *see* 50 C.F.R. § 402.14(a). "Action" is broadly defined to include "actions intended to conserve listed species," "the granting of licenses, contracts, leases, easements, rights-of-way, permits, or grants-in-aid,"

18

or any other action that may directly or indirectly cause modifications to the land, water, or air. 50 C.F.R. § 402.02.

49.     Section 7 requires an action agency to engage in formal or informal consultation with the expert wildlife agency when a proposed action "may affect" listed species or critical habitat. *Id*. §§ 402.13, .14. Formal consultation concludes with the issuance of a biological opinion that determines whether the action is likely to jeopardize the continued existence of the listed species. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h). Jeopardy exists if an action reasonably would be expected, directly or indirectly, to appreciably reduce the likelihood of the survival and recovery of a listed species in the wild. 50 C.F.R. § 402.02. If the wildlife agency concludes that the proposed action is likely to jeopardize the species, it must specify reasonable and prudent alternatives that would avoid the likelihood of jeopardy. 16 U.S.C. § 1536(b)(3)(A); 50 C.F.R. § 402.14(h)(2).

50.     The ESA further requires the wildlife agency to provide an incidental take statement with the biological opinion when it anticipates that incidental take of a threatened or endangered species will occur. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i). The statement must specify the permissible level of take. 16 U.S.C. § 1536(b)(4); 50 C.F.R. § 402.14(i)(1)(i). In addition, the incidental take statement must include reasonable and prudent measures that the wildlife agency considers necessary or appropriate to minimize the effects of take, as well as reporting requirements and other terms and conditions with which the action agency must comply in order to implement the reasonable and prudent measures. 16 U.S.C. § 1536(b)(4)(B); 50 C.F.R. § 402.14(i)(1).

51.     After the issuance of a biological opinion, it is up to the action agency to "determine whether and in what manner to proceed with the action in light of its section 7

19

obligations and the [wildlife agency's] biological opinion." 50 C.F.R. § 402.15(a). Thus, the substantive duty to ensure against jeopardy to listed species remains in effect regardless of the status of the consultation. *City of Tacoma v. FERC*, 460 F.3d 53, 75–76 (D.C. Cir. 2006).

## IV. ADMINISTRATIVE PROCEDURE ACT

52. The APA confers a right of judicial review on any person who is adversely affected by agency action. 5 U.S.C. § 702.

53. The APA provides that the reviewing court "shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id*. § 706(2)(A).

54. Under the APA, a court shall also "hold unlawful and set aside" any agency action that was promulgated "without observance of procedure required by law." *Id*. § 706(2)(D).

55. The adequacy of an agency's NEPA analysis and its compliance with NEPA's requirements are reviewed for arbitrary and capricious action under the APA's standard.

56. "[W]here an agency concludes that NEPA does not apply to its actions at all, the agency's decision is 'not entitled to the deference that courts must accord to an agency's interpretation of its governing statute and is instead a question of law, subject to de novo review.'" *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 22–23 (D.D.C. 2013) (quoting *Sierra Club v. U.S. Dep't of Agric.*, 777 F. Supp. 2d 44, 54 (D.D.C. 2011)); *see Citizens Against Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1150–51 (D.C. Cir. 2001).

## V. RECONCILIATION ACT

57. Enacted on July 4, 2025, the Reconciliation Act establishes requirements for certain offshore lease sales in the Gulf between December 2025 and March 2040. Pub. L. No. 119-21, § 50102, 139 Stat. 72, 139–42 (2025).

58. In particular, the Reconciliation Act provides that "the Secretary of the Interior

shall conduct a minimum of 30 region-wide oil and gas lease sales, in a manner consistent with the schedule described in subparagraph (B), in the region identified in the map depicting lease terms and economic conditions accompanying the final notice of sale of the Bureau of Ocean Energy Management entitled 'Gulf of Mexico Outer Continental Shelf Region-Wide Oil and Gas Lease Sale 254.'" *Id.* § 50102(a)(1)(A). BBG2 is the second region-wide lease sale in the Gulf under this act.

59.     The Reconciliation Act provides that in conducting these lease sales, the Secretary of the Interior shall "offer the same lease form, lease terms, economic conditions, and lease stipulations 4 through 9 as contained in the final notice of sale" for Lease Sale 254 held in 2020, and "may update lease stipulations 1 through 3 and 10 described in that final notice of sale to reflect current conditions." *Id.* § 50102(b)(1)(A)–(B).

60.     The Reconciliation Act further provides that in conducting these lease sales, the Secretary of the Interior shall "offer not fewer than 80,000,000 acres" or "if there are fewer than 80,000,000 acres that are unleased and available, offer all unleased and available acres." *Id.* § 50102(b)(3).

## STATEMENT OF FACTS

I.     THE RICH ECOSYSTEM OF THE GULF OF MEXICO

61.     The Gulf of Mexico is an extraordinary aesthetic, economic, and environmental resource to the five Gulf Coast states and the nation, supporting some of the most productive and biodiverse tropical and temperate ecosystems in the United States.

62.     The Gulf is home to thousands of marine species, ranging from simple invertebrates, such as conchs and sponges, to complex and highly evolved fish and marine mammals. Five of the world's seven species of sea turtles, as well as hundreds of shore and coastal bird species, reside in or migrate through the Gulf of Mexico. Over 300 species of

21

coral—as well as other hard-bottom communities, wetlands, seagrass beds, mangroves, and soft bottom communities—provide the habitats necessary to support this rich assemblage of marine life.

63.    Over two dozen marine and coastal species living in the Gulf of Mexico are listed as endangered or threatened under the Endangered Species Act. Among them is the Rice's whale—the only whale species endemic to the Gulf of Mexico and one of the most endangered whales on the planet, with perhaps as few as fifty-one individuals remaining, according to NMFS' most recent estimates.

64.    The Gulf of Mexico's environmental beauty and productivity also support a robust economy. The region produces more than one-third of the nation's domestic seafood supply. The Gulf's commercial fisheries and coastal tourism generate more than $40 billion annually in economic activity in the five Gulf Coast states.

II.    ENVIRONMENTAL HARMS FROM OIL AND GAS DEVELOPMENT

65.    Existing oil and gas exploration, development, and production on the Gulf of Mexico Outer Continental Shelf is extensive. As of May 2026, there were more than 2,000 active oil and gas leases across eleven million acres in the Gulf.

66.    Oil and gas leasing, exploration, development, and production, along with their associated operations, involve numerous activities that individually and collectively have myriad adverse effects on the Gulf's species and habitats. Lessees conduct seismic surveys to locate oil and gas deposits; drill wells; install pipelines and other structures on the seafloor and through coastal wetlands; pump oil and gas to the surface; load and transport oil, gas, and cargo on ships; produce liquid, solid, and gaseous waste; and conduct other activities with harmful environmental effects.

67.    Effects from these activities on the environment include vessel strikes, noise

22

(from vessels, seismic surveys, construction, and general operations), oil spills (both large and small), bottom habitat destruction, and marine debris and other water pollution. Oil and gas activities also degrade air quality, contribute to climate change, erode coastal wetlands, impair commercial and recreational fishing opportunities, harm archaeological resources, and degrade recreational and aesthetic experiences.

68.    The harms from oil and gas activities can become catastrophic, such as when the Deepwater Horizon rig exploded and sank on April 20, 2010, killing eleven people and causing the biggest environmental disaster in the history of the Gulf. *See generally In re Oil Spill by Oil Rig Deepwater Horizon in Gulf of Mexico, on Apr. 20, 2010*, 21 F. Supp. 3d 657 (E.D. La. 2014).

69.    The Deepwater Horizon explosion caused oil to gush from the well on the seabed, nearly 5,000 feet below the ocean's surface, for months until the well finally was capped in mid-July 2010. The result was the largest oil spill in the history of the United States and a cleanup and containment effort that at its height enlisted 50,000 workers on land and sea. Over the eighty-seven days during which the well remained uncapped, over 100 million gallons of oil and unquantified amounts of natural gas flowed freely into the Gulf. In an effort to break apart large concentrations of oil, responders released one million gallons of toxic dispersants into Gulf waters. The spill contaminated over 112,000 square kilometers of ocean waters and over 2,100 kilometers of shoreline in the Gulf.

70.    Scientists estimate the spill caused death or serious harm to trillions of animals, including over 100,000 individuals of species listed as threatened or endangered. The Rice's whale, for example, experienced a twenty-two percent population loss as a result of the 2010 Deepwater Horizon disaster, and it has not and may not ever recover. The spill marred coastal and bottom habitats, causing severe damage to the ecosystems that support the Gulf's

23

biodiversity. The harm from the spill to marine and coastal species and the environment persists to this day.

71.    Despite the lessons of the catastrophic Deepwater Horizon disaster, oil and gas operations in the Gulf of Mexico continue to experience accidents, spill oil, and otherwise cause environmental harm on a daily basis. For example, a 26,000-barrel spill occurred in November 2023 resulting from degradation of the Main Pass Oil Gathering pipeline off the coast of Louisiana, while the Taylor Energy well platform spill has released over three million barrels of oil into the Gulf since the platform was struck by Hurricane Ivan in 2004 and continues leaking to this day. Hundreds of oil and chemical spills in the Gulf are reported to the Coast Guard each year.

72.    In recent years, drilling activity has been shifting to deeper waters and into high-heat and high-pressure geologic formations, where the risks of well blowouts and catastrophic oil spills are greater.

73.    Oil and gas activities in the Gulf have direct impacts on coastal and environmental justice communities. Refineries and petrochemical plants that rely on oil and gas produced in the Gulf region are more likely to be in low-income and communities of color, and certain communities in Louisiana and Texas have the highest concentration of refineries, petrochemical plants, and other oil and gas infrastructure in the United States. In Louisiana, for instance, an approximately eighty-five-mile stretch along the Mississippi River, from Baton Rouge to New Orleans, has long been known as "Cancer Alley." The area contains more than 200 industrial facilities that release significant amounts of harmful air pollution and is marked by low income levels and high poverty levels. These communities are often overwhelmingly Black: seventy-nine census tracts in Jefferson, St. John the Baptist, East Baton Rouge, and Orleans

24

Parishes are made up of at least ninety percent Black residents. Locals have long experienced health problems including high rates of cancer, respiratory illnesses, and rashes.

74.    The extensive amount of oil and gas activity in the Gulf has also turned it into an oil and gas junkyard. Thousands of wells and hundreds of platforms remain overdue for decommissioning. Decommissioning is the process of permanently plugging oil and gas wells and the clean-up and removal of pipelines, platforms, and other infrastructure used to develop wells. Oil companies are generally required to decommission oil and gas infrastructure after a lease terminates, or when the infrastructure is considered no longer useful for operations. But because decommissioning is expensive, companies use various tactics to delay, stall, and ultimately avoid fulfilling their decommissioning obligations, and the federal government regularly permits deviations from its decommissioning requirements.

75.    For example, according to a 2024 Government Accountability Office report, seventy-five percent of end-of-lease and idle infrastructure in the Gulf of Mexico was overdue for decommissioning as of 2023, representing over 2,700 wells and 500 platforms. Within that backlog, operators had not even temporarily plugged about 1,300 wells, "meaning[] they had not taken interim steps to install long-term barriers to prevent leaks before decommissioning." Moreover, a significant number of overdue idle wells had not been used for extended periods of time—more than 800 of them had not produced in more than ten years. A 2021 Government Accountability Office report similarly found that the federal government has authorized ninety-seven percent of Gulf pipelines—or roughly 18,000 miles—to be left on the seafloor at the end of their useful lives. The same report found that the federal government has authorized decommissioning-in-place of almost 250 umbilical lines, which provide electrical and hydraulic power to subsea infrastructure. The decommissioning backlog is only expected to grow.

76.     Available scientific information indicates that this delinquent infrastructure poses significant threats to the environment. For example, offshore infrastructure readily corrodes due to constant exposure to saltwater and the elements, which can cause equipment failure and pollution. Old wells are particularly susceptible to oil spills or other accidents, especially when they have not been properly maintained. These risks were highlighted recently on April 26, 2025, when Well 59—a shut-in eighty-two-year-old well that had not produced oil since 1997—blew out in the state waters off Louisiana and leaked for over a week. The oily sheen appeared to enter established and proposed critical habitat for protected species, including loggerhead sea turtles, piping plovers, and Rice's whales. Federal pollution reports include many additional instances of oil sheens associated with defunct oil and gas infrastructure. Unplugged and temporarily plugged wells also leak methane—a powerful greenhouse gas—that can be released into the atmosphere from wells in shallow waters or cause harm to marine life when leaking from wells in deeper waters.

77.     Decommissioned-in-place pipelines are also subject to corrosion, hurricane damage, seafloor erosion, mudslides, and damage from maritime activities. This is particularly concerning in light of the Government Accountability Office's 2021 findings that the federal government "does not have a robust process to address the safety and environmental risks posed by leaving decommissioned pipelines in place on the seafloor." For example, mercury, one of the most toxic metals in the environment, can accumulate within pipelines decommissioned-in-place and pollute the seafloor and water if the pipelines are damaged. And defunct platforms topple and cause spills or other accidents, and leach harmful chemicals into the marine environment. The Government Accountability Office's 2021 report also notes that decommissioned-in-place umbilical lines pose environmental risks because they "often contain hazardous chemicals, and it

is not feasible to properly clean them."

78.    Additionally, a growing number of oil and gas companies are going bankrupt, which prolongs decommissioning delays and often leaves "orphaned" infrastructure with no solvent operator to decommission it. As of April 2026, the U.S. Department of the Interior held over $195 million in orphan infrastructure liability from just ten operator bankruptcies, roughly sixty-eight percent of which is not covered by surety bonds to defray the costs. The federal government is currently exposed to billions of dollars in potential decommissioning liability not backed by financial assurances to backstop companies' decommissioning obligations—a figure that will increase with new offshore oil and gas leasing. The Bureau is also in the process of revising its financial assurances rules to eliminate billions of dollars' worth of bonding in order to incentivize offshore production. 91 Fed. Reg. 11212, 11213, 11229 (Mar. 9, 2026).

III.    CLIMATE CHANGE IN THE GULF OF MEXICO

79.    The world has warmed substantially over the last 150 years, with remarkable acceleration in recent decades, resulting in changes in surface, atmospheric, and oceanic temperatures, melting glaciers, reduced snow cover, shrinking sea ice, rising sea levels, ocean acidification, and changes in precipitation patterns, among other effects. Human activities, especially emissions of greenhouse gases, are primarily responsible. The main human activity that emits greenhouse gases is the combustion of fossil fuels—including oil and gas—for energy and transportation. This warming is expected to continue, and its effects will accelerate and intensify.

80.    Climate change will undoubtedly affect the habitat, behavior, abundance, and distribution of all species present in the Gulf of Mexico. It will bring increased storms, flooding, rising seas, and other severe harms to the region. In fact, the effects of climate warming are already being acutely felt by vulnerable Gulf communities.

81.    For example, an extreme marine heat wave in the summer of 2023 in the eastern Gulf led to severe coral bleaching that decimated populations of imperiled elkhorn and staghorn coral, which had been part of the Caribbean's coral reef systems for more than 250,000 years but are now functionally extinct in Florida.

82.    Storms are becoming increasingly severe in the Gulf region in the face of climate change. For example, Hurricane Harvey was a Category 4 storm when it hit the coast of Texas in 2017. It dumped 60.5 inches of rain during the multi-day onslaught, killing at least sixty-three people and affecting millions of others in several states, and caused $125 billion in damage overall. In 2022, Hurricane Ian became the deadliest storm to strike the southwest coast of Florida since 1935, resulting in at least 148 deaths and $50 billion in damage. Scientists have concluded that climate change made these hurricanes more powerful and increased their deadly flooding.

83.    These strong storms also frequently cause damage to infrastructure such as oil pipelines and offshore platforms. For example, Hurricane Ivan in 2004 caused a massive seafloor shift that toppled a production platform and resulted in the longest recorded spill in U.S. history. In 2005, hurricanes Katrina and Rita destroyed 113 offshore platforms, damaged more than 450 pipelines, and led to six spills of 1,000 barrels or more. Hurricane Ike in 2008 caused twenty-four spills (eighteen from platforms and six from pipelines) totaling over 5,000 barrels of oil released into the environment.

84.    Deteriorated idle infrastructure is particularly susceptible to hurricane damage, and storm damage prolongs decommissioning delays. For example, one-third of the offshore oil and gas structures destroyed by Hurricanes Gustav and Ike had been out of use for about eight years on average. According to a 2015 Government Accountability Report, "decommissioning a

28

storm-damaged structure may cost 15 times or more the cost of decommissioning an undamaged structure," as the salvage work involved is dangerous, difficult, and time-consuming.

85.     Flooding has become a common occurrence in Louisiana as a result of climate warming, bringing damage and destruction to the state. For example, in 2020, Hurricane Laura caused damage to industrial facilities that led to elevated toxic emissions along the Louisiana coast.

86.     Sea level rise and coastal erosion is an acute threat in the Gulf Region. Communities in Gulf states, such as the tribal community of Isle de Jean Charles in Louisiana, are being relocated because of severe land loss, sea level rise, and coastal flooding.

87.     The exploration, development, and production of oil and gas in the Gulf will release greenhouse gases from the use of combustion engines, construction, drilling, and through the deliberate or accidental release of methane.

IV.     RECENT ENDANGERED SPECIES ACT ACTIONS FOR GULF OIL AND GAS OPERATIONS

88.     In March 2020, NMFS issued a biological opinion pursuant to Section 7 of the Endangered Species Act, 16 U.S.C. § 1536, concluding that existing and planned activities related to the exploration and development of oil and gas on the Gulf of Mexico outer Continental Shelf will likely jeopardize the continued existence of the Rice's whale. NMFS reached this conclusion because of the "wide-ranging, combined multiple effects to the small and likely declining population" from five "combined stressors:" vessel strikes, vessel noise, marine debris, oil spills and dispersants, and sound from seismic surveys. NMFS explained that these stressors can cause mortality, along with chronic stress, behavioral disruption, significant masking, and hearing loss, "all of which are expected to reduce the fitness of individuals."

89.     In the 2020 biological opinion, NMFS included a reasonable and prudent

29

alternative to address two of those threats: vessel strikes and vessel noise. Specifically, the reasonable and prudent alternative restricted vessel activity in Rice's whale habitat in the eastern Gulf, including a requirement that oil and gas vessels travel at no more than ten knots through the area year-round and a prohibition on oil and gas vessels traveling through the area at night or at times of low visibility, except in emergencies for the safety of the vessel or crew. NMFS determined that the reasonable and prudent alternative would reduce the number of lethal vessel strikes of Rice's whales from seventeen whales to twelve, and the number of sublethal vessel strikes from six whales to four.

90.     In 2024, a federal district court found that the 2020 biological opinion violated the ESA and APA because NMFS failed to address all stressors likely to affect the Rice's whale, underestimated the risk and harms of oil spills to protected species, incorrectly assumed that the population of Rice's whales remained the same after the Deepwater Horizon oil spill, failed to recognize oil spill take as incidental take, and adopted an "irrational surrogate" to determine take by vessel strikes, among other defects. *Sierra Club v. Nat'l Marine Fisheries Serv.*, 797 F. Supp. 3d 440 (D. Md. 2024).

91.     NMFS issued a new biological opinion in May 2025 that covers the management and regulation of OCS oil and gas-related activities under OCSLA from 2025 through 2029. Because it was issued prior to the passage of the Reconciliation Act, the 2025 biological opinion does not include this lease sale in the defined agency action. Nor does it purport to evaluate the effects of Reconciliation Act lease sales, such as BBG2. The 2025 biological opinion again concludes that the activities covered will likely jeopardize the continued existence of the Rice's whale but only due to "the lethal and sub-lethal effects of vessel strike." NMFS determined that the imposition of a reasonable and prudent alternative that only includes measures to reduce

vessel strike risk would prevent jeopardy to the species.

92.    The Bureau has not formally adopted the reasonable and prudent alternative developed by NMFS in the 2025 biological opinion.

93.    The 2025 biological opinion has been the subject of two separate legal challenges. On January 23, 2026, the Western District of Louisiana found that various aspects of the 2025 biological opinion violated the ESA and APA. *Louisiana v. NMFS*, 817 F. Supp. 3d 390 (W.D. La. 2026). The 2025 biological opinion is also being challenged in the District of Maryland. *Sierra Club v. NMFS*, No. CV DLB-25-1627 (D. Md. filed May 20, 2025).

94.    On March 31, 2026, members of the Endangered Species Committee, as established by 16 U.S.C. § 1536(e), held a meeting where it exempted certain Gulf oil and gas activities from section 7(a)(2) of the Endangered Species Act based on a national security determination made by the Secretary of War pursuant to 16 U.S.C. § 1536(j). 91 Fed. Reg. 16966 (Apr. 3, 2026). According to the notice, the exemption applies to "Gulf of America Oil and Gas Activities," which the Committee defined as the oil and gas exploration, development, and production activities, as well as the avoidance or minimization measures, that were analyzed in NMFS's 2025 biological opinion," along with 2018 and 2025 consultation decisions issued by the U.S. Fish & Wildlife Service. *Id*. None of these actions covered Reconciliation Act lease sales. The exemption itself is also the subject of several legal challenges.

V.    THE BBG2 LEASE SALE

95.    Following the passage of the Reconciliation Act, the Bureau announced on August 19, 2025, that it was deferring lease sales planned under the current 2024–2029 five-year plan to focus instead on implementing the Reconciliation Act's leasing provisions.

96.    In a September 2025 briefing on Reconciliation Act lease sales, including BBG2, the Bureau included a slide entitled "Environmental Review and Consultation" which stated that

31

"DOI's Office of the Solicitor (SOL) has advised that the environmental statutes listed below no longer apply at the lease sale stage for [Reconciliation Act] mandated sales." NEPA and the ESA were among the six statutes listed. OCSLA was not.

97.     On November 5, 2025, Defendant Giacona sent a 27-page memorandum to Jacob M. Tyner, the Deputy Assistant Secretary for Land and Minerals Management, entitled, "Recommendations for Decision on the Final Notice of Sale for Gulf of America Outer Continental Shelf Oil and Gas One Big Beautiful Bill Act Lease Sale 1 (Lease Sale BBG1, scheduled for December 10, 2025)" (the "Decision Memo"). Among other items, the Decision Memo discussed the "Discretionary Terms and Conditions of the Sale," including sale size, information to lessees, and royalty rates, and requested Mr. Tyner's decision on these issues. Defendant Giacona exercised this discretion to recommend the largest lease sale with the lowest royalty rates to incentivize the maximum amount of oil and gas production. The Decision Memo also contained Defendant Giacona's determination that NEPA and the consultation provisions of the ESA and several other statutes "are not applicable at the lease sale stage" for Reconciliation Act lease sales. Mr. Tyner signed and concurred with the statements in the Decision Memo approximately 30 minutes after it was signed by Defendant Giacona.

98.     On November 20, 2025, the Bureau issued a notice of availability of the Proposed Notice of Sale for BBG2, which was signed by Defendant Giacona. 90 Fed. Reg. 52430 (Nov. 20, 2025). The Proposed Notice of Sale stated that the BBG2 lease sale would be held on March 11, 2026. It described the lease blocks that are withdrawn from leasing and further stated that the Bureau reserved the right to reject "any and all bids" as well as to withdraw any block from the lease sale prior to bid acceptance. The Proposed Notice of Sale further provided that each lease would be issued "pursuant to the [Reconciliation Act] and OCSLA, 43 U.S.C. 1331 *et seq.*, as

amended, and is subject to OCSLA implementing regulations promulgated pursuant thereto in 30 CFR part 556, and other applicable statutes and regulations in existence upon the effective date of the lease, as well as those applicable statutes enacted and regulations promulgated thereafter, except to the extent that the after-enacted statutes and regulations explicitly conflict with an express provision of the lease."

99. As part of the Proposed Notice of Sale package, the Bureau released lease stipulations for BBG2. Based on the Reconciliation Act, the Bureau stated that it was offering the same lease stipulations 4 through 9 as contained in Lease Sale 254, which was finalized in February 2020, while stipulations 1, 2, 3, and 10 were updated to reflect current conditions. Stipulation 4, the "Protected Species" stipulation from Lease Sale 254, is based upon outdated science and mitigation measures that were developed in 2015 and 2016, prior to the listing of the Rice's whale as endangered or the proposed designation of its critical habitat. The stipulation makes no mention of the Rice's whale and fails to provide any specific protections for this critically endangered species. However, Stipulation 4 also reiterates that the Bureau must comply with the ESA for activities on the OCS.

100. The Proposed Notice of Sale package also included Information to Lessees designed to inform potential bidders of applicable federal requirements. The Protected Species section of the Information to Lessees further discussed the need to comply with the Endangered Species Act and relevant biological opinions for post-leasing activities but provided no information regarding ESA compliance for the BBG2 lease sale itself.

101. On January 20, 2026, Plaintiffs Center for Biological Diversity, Friends of the Earth, and Sierra Club submitted comments on the Proposed Notice of Sale arguing that the Bureau must, prior to holding any Reconciliation Act lease sale: prepare an EIS under NEPA;

33

comply with OCSLA's requirements to consider available relevant information in making decisions and to conduct an environmental study of the region included in the sale; and ensure that the lease sale is not likely to jeopardize the continued existence of Rice's whale and other protected species, in accordance with the ESA. The comments noted that Plaintiffs had already exhaustively detailed environmental harms of the sale—including the environmental and economic consequences of overdue decommissioning and the damaging impacts of oil and gas activity on the Rice's whale and environmental justice communities—in comments submitted on the Draft Programmatic Environmental Impact Statement for the "deferred" Lease Sale 262 and the Proposed Notice of Sale for Lease Sale 262, and requested that those comments be considered as part of the record for this sale. The comments also reminded the Bureau that it retains meaningful discretion to act on environmental considerations in holding the lease sale, including through rejecting bids. Finally, the comments urged the Bureau to include in its Information to Lessees a statement that the agency will reject any bid submitted by a company that has failed to decommission its existing facilities in a timely manner and a statement reserving the right to reject bids on parcels located in proposed Rice's whale critical habitat.

102.    On February 5, 2026, the Bureau issued the Final Notice of Sale for BBG2 with the same lease stipulations that were included in the proposed notice. 91 Fed. Reg. 5251 (Feb. 5, 2026). Just as Defendant Giacona had recommended in the Decision Memo for BBG1, the BBG2 lease sale was of the maximum size, 80.4 million acres, with the lowest royalty rates. The Final Notice of Sale was signed by Defendant Giacona. *Id*. at 5259.

103.    On March 11, 2026, the Bureau held the BBG2 lease sale and received 38 bids on 25 blocks across approximately 141,000 acres of the Gulf. The vast majority of bids were for tracts in deepwater (greater than 1,000 feet in depth) and ultra-deepwater (greater than 5,000 feet

in depth). At least one bid was located directly within or adjacent to Rice's whale proposed critical habitat. Moreover, companies with significant numbers of unplugged wells, such as Chevron U.S.A., Inc., submitted several bids on new lease blocks. The Bureau made no attempt to comply with NEPA, the consultation provisions of the ESA, or the studies and information requirement of OCSLA prior to holding the lease sale.

## VI.    DEFENDANT GIACONA'S IMPROPER INVOLVEMENT IN BBG2

104.    Defendant Giacona, the Acting Director of the Bureau, started his tenure with the agency in March 2025. Prior to starting his tenure with the Bureau in March 2025, Defendant Giacona was NOIA's Vice President of Government Affairs, where he engaged in advocacy on behalf of the full membership of NOIA regarding offshore energy matters. NOIA members include companies that regularly bid on Gulf lease sales, including BBG2.

105.    On March 27, 2025, the Department of the Interior Ethics Office issued "Interim Ethics Guidance on Recusal Obligations" to Defendant Giacona. The interim guidance stated that Defendant Giacona should not participate in any matter without authorization "if you know that a person with whom you have a 'covered relationship' is or represents a party [in] a particular matter involving specific parties, and you determine that the circumstances would cause a reasonable person with knowledge of the relevant facts to question your impartiality in the matter." "Covered relationship" is defined to include "[a]ny person for whom you have, within the last year, served as officer, director, trustee, general partner, agent, attorney, consultant, contractor or employee." 5 C.F.R. § 2635.502(b)(1). The interim guidance also stated that in other circumstances that raise a question regarding impartiality, Defendant Giacona "must consider the relevant facts about the particular matter in question and determine whether you believe that a reasonable person with knowledge of those facts would question your impartiality in performing your official duties in the particular matter." *See* 5 C.F.R. § 2635.502(a)(3).

106.    On July 25, 2025, the Ethics Office finalized Defendant Giacona's "Ethics Guidance on Recusal Obligations." The Ethics Office determined that Defendant Giacona has a "covered relationship" with NOIA, and reaffirmed that he should not participate personally and substantially in particular matters that effect NOIA's financial interest or where "a reasonable person with knowledge of the relevant facts would question your impartiality." The Ethics Office further determined that Defendant Giacona does not have a "covered relationship" with NOIA's members, but reiterated that prior to participating in a particular matter in which "NOIA is a party or represents a party," Defendant Giacona "should carefully consider whether a reasonable person with knowledge of the relevant facts would question your impartiality in the matter." The Ethics Office stated that Defendant Giacona "must take steps to avoid any action that creates the appearance that you are violating the law or the ethics standards set forth in 5 C.F.R. Part 2635."

107.    Despite this direction from the Ethics Office, Defendant Giacona has been personally and substantially engaged in Gulf offshore lease sales throughout his tenure at the Bureau, including BBG2. For example, on November 5, 2025, Defendant Giacona issued the Decision Memo, which recommended lease sales of the maximum size with the lowest royalty rates to maximize oil and gas production and provided the Bureau's determination that the environmental review requirements of NEPA, the consultation provisions of the ESA, and several other environmental statutes do not apply to Reconciliation Act lease sales. Defendant Giacona also signed the Final Notice of Sale for BBG2.

### CLAIMS FOR RELIEF

### First Cause of Action

### Violation of NEPA and APA: Failure to Prepare an EIS for BBG2

108.    The allegations made in paragraphs 1–107 are realleged and incorporated by this reference.

109. NEPA requires federal agencies to prepare an EIS for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Major federal actions include any action that is subject to "substantial Federal control and responsibility." 42 U.S.C. § 4336e(10).

110. Offshore lease sales have long been considered "major Federal actions" under NEPA. *Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827 (D.C. Cir. 1972). The U.S. Department of the Interior's Handbook of National Environmental Policy Act Implementing Procedures recognizes that the "[a]pproval of offshore oil and gas lease sales" is a major action normally requiring an EIS. 516 Department Manual § 15.4(1). Moreover, "the lease sale stage is the last point at which the Bureau is definitively required to conduct an EIS for leases in the Gulf of Mexico." *Friends of the Earth*, 583 F. Supp. 3d at 133–34.

111. Despite this authority, the Bureau has taken the position that it is not required to comply with NEPA for BBG2 due to the provisions of the Reconciliation Act and has not issued any Record of Decision to document a final decision under NEPA or stated that it is relying upon any EIS to satisfy its NEPA obligations. However, nothing in the Reconciliation Act exempts the Bureau from its legal obligations under NEPA with regard to BBG2. *See Izaak Walton League of Am. v. Marsh*, 655 F.2d 346, 367 (D.C. Cir. 1981) ("Given Congress' clearly expressed desire to ensure that all government actions are taken in accordance with NEPA, and its ability to expressly override the requirements of the Act, we believe that, even when substantive legislation is involved, repeal by implication should be found only in the rarest of circumstances.").

112. By failing to prepare an EIS to identify and assess the environmental effects of BBG2, Defendants acted in a manner that was arbitrary, capricious, an abuse of discretion, and

not in accordance with law, and without observance of procedure required by law, in violation of NEPA, 42 U.S.C. § 4336a(c), and the APA, 5 U.S.C. §§ 701–06.

113. These actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at law.

### Second Cause of Action

**Violation of OCSLA: Failure to Consider Available Relevant Environmental Information in Making Decisions and Failure to Prepare Required Environmental Studies**

114. The allegations made in paragraphs 1–113 are realleged and incorporated by this reference.

115. OCSLA requires that the Secretary must "consider available relevant environmental information in making decisions" under OCSLA, "including those relating to exploration plans, drilling permits, and development and production plans[], in developing appropriate regulations and lease conditions, and in issuing operating orders." 43 U.S.C. § 1346(d).

116. It also requires that the Secretary, at least six months prior to a lease sale, "shall conduct a study of any area or region included in any oil and gas lease sale or other lease in order to establish information needed for assessment and management of environmental impacts on the human, marine, and coastal environments" that may be affected by oil and gas development. *Id.* § 1346(a)(1); 30 C.F.R. § 556.1300(a). The study must predict, *inter alia*, impacts on marine biota resulting from chronic low-level pollution, large spills, and "the laying of pipe," and be designed to predict "the impacts of development offshore on the affected and coastal areas." 43 U.S.C. § 1346(a)(3).

117. Here, the Bureau failed to consider available relevant environmental information, including information regarding the harms of delayed decommissioning, prior to issuing the

Final Notice of Sale for BBG2.

118.    The Bureau also failed to study the impacts of oil and gas infrastructure that is idle, orphaned, or otherwise overdue for decommissioning prior to issuing the Final Notice of Sale for BBG2.

119.    By failing to study or consider the impacts related to delayed decommissioning prior to issuing the Final Notice of Sale for BBG2, Defendants violated OCSLA, 43 U.S.C. § 1346, and its implementing regulations, 30 C.F.R. § 556.1300.

120.    These actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at law.

### Third Cause of Action

### Violation of ESA: Failure to Engage in Section 7 Consultation to Ensure that BBG2 is Not Likely to Jeopardize Endangered Species

121.    The allegations made in paragraphs 1–120 are realleged and incorporated by this reference.

122.    Section 7(a)(2) of the ESA requires each federal agency, in consultation with the appropriate wildlife agency, to ensure that any action authorized, funded, or carried out by the agency is not likely to jeopardize the continued existence of any threatened or endangered species. 16 U.S.C. § 1536(a)(2); *see* 50 C.F.R. § 402.14(a).

123.    Despite the fact that NMFS has repeatedly concluded that oil and gas activities in the Gulf are likely to jeopardize the continued existence of the Rice's whale, the Bureau failed to consult with the appropriate wildlife agency under Section 7(a)(2) or take any action to ensure that BBG2 was not likely to jeopardize the continued existence of the Rice's whale. The Bureau also failed to address significant new evidence provided by Plaintiffs regarding the adverse impacts of Gulf oil and gas activities on the Rice's whale, including recent science regarding the

distribution and persistent occurrence of the species in the central and western Gulf, habitat suitability analyses conducted by NMFS, threats posed by oil spills, impacts of noise from seismic surveys, and the vulnerability of the species to vessel strikes.

124.    By failing to engage in Section 7 consultation or otherwise ensure that BBG2 is not likely to jeopardize the continued existence of the Rice's whale, Defendants violated the ESA, 16 U.S.C. § 1536(a)(2), and its implementing regulations, 50 C.F.R. § 402.14(a).

125.    These actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at law.

### Fourth Cause of Action

### Violation of the APA: Improper Involvement of Defendant Giacona

126.    The allegations made in paragraphs 1–125 are realleged and incorporated by this reference.

127.    In reviewing an agency action, a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary and capricious under the APA where the agency (1) has relied on factors which Congress has not intended it to consider; (2) entirely failed to consider an important aspect of the problem; (3) offered an explanation for its decision that runs counter to the evidence before the agency; or (4) offered an explanation that is so implausible that it could not be ascribed to a difference of view or the product of agency expertise. *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mutual Automobile Ins.*, 463 U.S. 29, 43 (1983).

128.    Prior to starting his tenure with the Bureau in March 2025, Defendant Giacona was the Vice President of Government Affairs with NOIA, where he engaged in advocacy on

behalf of the full membership of NOIA regarding offshore energy matters. Upon onboarding with the Bureau in March 2025, Defendant Giacona was directed by the Department of the Interior Ethics Office to recuse himself from matters which he knew would have a direct and predictable effect on the financial interests of his former employer, including oil and gas lease sales in the Gulf. On July 25, 2025, the Ethics Office finalized Defendant Giacona's Recusals & Screening Arrangement. The Ethics Office determined that Defendant Giacona has a "covered relationship" with NOIA, and reaffirmed that he should not participate personally and substantially in particular matters that effect NOIA's financial interest or where "a reasonable person with knowledge of the relevant facts would question your impartiality." While the Ethics Office determined that Defendant Giacona does not have a "covered relationship" with NOIA's members, it reiterated that prior to participating in a particular matter in which "NOIA is a party or represents a party," Defendant Giacona "must take steps to avoid any action that creates the appearance that you are violating the law or the ethics standards set forth in 5 C.F.R. Part 2635."

129.    Despite these ethics rules and direction from the Department of the Interior Ethics Office, Mr. Giacona participated personally and substantially in the review and approval of oil and gas lease sales in the Gulf throughout his tenure with the Bureau, including BBG2, and has directly advocated for offshore lease sales on terms that were the most favorable to his prior employer and its members.

130.    Given Defendant Giacona's extensive involvement in the approval of BBG2, Defendants acted in a manner that was arbitrary, capricious, an abuse of discretion, and not in accordance with law, and without observance of procedure required by law, in violation of the APA, 5 U.S.C. §§ 701–06.

131.    These actions have harmed Plaintiffs, and Plaintiffs have no adequate remedy at

law.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiffs pray that this Court:

1.      Declare that Defendants' decision to hold the BBG2 lease sale violated NEPA, OCSLA, the ESA, and the APA, and is arbitrary and capricious, not in accordance with law, and without observance of procedure required by law in violation of the APA;

2.      Declare that the Bureau violated NEPA and the APA by failing to conduct an environmental review for BBG2;

3.      Declare that the Bureau violated OCSLA by failing to consider relevant available information regarding impacts from BBG2 and failing to prepare an environmental study;

4.      Declare that the Bureau violated the ESA by failing to comply with the Section 7 consultation requirements or otherwise ensure that BBG2 is not likely to jeopardize the continued existence of the endangered Rice's whale;

5.      Declare that the Final Notice of Sale for BBG2 is arbitrary and capricious, in violation of the APA and OCSLA;

6.      Declare that any bids received by the Bureau in connection with holding the BBG2 lease sale are not acceptable given Defendants' violations of NEPA, OCSLA, the ESA, and the APA;

7.      Vacate the Final Notice of Sale for BBG2;

8.      Vacate or enjoin any bids accepted or leases executed pursuant to BBG2, and any activity on leases executed pursuant to BBG2;

9.     Enter any other appropriate declaratory or injunctive relief to ensure that Defendants comply with NEPA, OCSLA, the ESA, and the APA, and to prevent irreparable harm to Plaintiffs and to the environment until such compliance occurs;

10.     Award Plaintiffs their costs, reasonable attorneys' fees, and other expenses pursuant to 28 U.S.C. § 2412, 43 U.S.C. § 1349(a)(5), and 16 U.S.C. § 1540(g)(4); and

11.     Grant such other and further relief as the Court may deem just and proper.

Respectfully submitted this 17th day of June 2026.

/s/ Stephen D. Mashuda
Stephen D. Mashuda (DC Bar No. WA0005)
EARTHJUSTICE
810 Third Ave., Suite 610
Seattle, WA 98104
206-741-1148 Telephone
415-217-2040 Fax
smashuda@earthjustice.org

George Torgun (*pro hac vice forthcoming*)
EARTHJUSTICE
180 Steuart St. #194330
San Francisco, CA 94105
415-217-2000 Telephone
415-217-2040 Fax
gtorgun@earthjustice.org

Ava Ibanez Amador (*pro hac vice forthcoming*)
EARTHJUSTICE
48 Wall Street, 15th Floor
New York, NY 10005
212-284-8043 Telephone
415-217-2040 Fax
aibanezamador@earthjustice.org

*Attorneys for Plaintiffs Healthy Gulf, Friends of the Earth, and Center for Biological Diversity*

43

/s/ Rachel Mathews

Rachel Mathews (DC Bar No. VA211)
CENTER FOR BIOLOGICAL DIVERSITY
2100 Franklin St., Suite 375
Oakland, CA 94612
(828) 774-5636
rmathews@biologicaldiversity.org

*Attorney for Plaintiff Center for Biological Diversity*

/s/ Devorah Ancel

Devorah Ancel (*pro hac vice forthcoming*)
SIERRA CLUB
PO Box 4998
Austin, TX 78765
415-845-7847 Telephone
devorah.ancel@sierraclub.org

*Attorney for Plaintiff Sierra Club*

/s/ Jared Solomon

Jared Solomon (DC Bar No. 90033165)
Erik Van de Stouwe (*pro hac vice forthcoming*)
NATURAL RESOURCES DEFENSE COUNCIL
1152 15th St., Suite 300
Washington, DC 20005
202-289-6868 Telephone
jsolomon@nrdc.org
evandestouwe@nrdc.org

Julia K. Forgie (*pro hac vice forthcoming*)
NATURAL RESOURCES DEFENSE COUNCIL
1314 Second St.
Santa Monica, CA 90401
310-434-2351 Telephone
jforgie@nrdc.org

*Attorneys for Plaintiff Natural Resources Defense Council*

44